IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY M. SELMON, | : | Civil No. 3:21-cv-1714 |
| | : | |
| Petitioner | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| WARDEN QUAY, | : | |
| | : | |
| Respondent | : | |

**MEMORANDUM**

Presently before the Court is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2241 (Doc. 1), filed by Petitioner Timothy Selmon ("Selmon"), an inmate in the

custody of the Federal Bureau of Prisons ("BOP"), housed at the United States Penitentiary,

Allenwood, in White Deer, Pennsylvania ("USP-Allenwood").  Selmon seeks release to a

Residential Reentry Center ("RRC") pursuant to the Second Chance Act and the First Step

Act.  He also contends that his due process rights were violated in the context of four

disciplinary hearings.  The petition is ripe for disposition and, for the reasons that follow, will

be denied.

I.    **Background**

Selmon is serving a 30-month term of imprisonment for possession of stolen

ammunition, imposed by the United States District Court for the Western District of Texas.

(Doc. 15-1, p. 6, Declaration of Erin Frymoyer, BOP Attorney, ¶ 3).  His projected release

date is May 13, 2022, *via* good conduct time.  (*Id.*).

On October 11, 2021, Selmon's Unit Team considered him for RRC placement pursuant to the Second Chance Act utilizing the five factor criteria set forth in 18 U.S.C. § 3621(b) and BOP Program Statement 7310.04, and concluded that he was ineligible for RRC placement.  (Doc. 15-1, p. 12-15).  Specifically, the Unit Team considered the likelihood of bed space, the nature of his offense, participation in education and self-improvement classes, sentencing court made recommendations, and the Sentencing Commission's policy concerning RRC placement.  (*Id.*).  The Unit Team also documented that there was a detainer warrant lodged by the state of Mississippi and noted that the "[o]ther detaining authority will take custody upon release." (*Id.* at pp. 12, 14).  In accordance with BOP Program Statement 7310.04, Community Corrections Center Utilization and Transfer Procedures, inmates "with unresolved pending charges, or detainers, which will likely lead to arrest, conviction, or confinement" are ordinarily excluded from participating in community corrections programs such as RRC placement.  (*Id.* at pp. 111-112).

Selmon received four separate incident reports while housed at the United States Medical Center for Federal Prisoners, in Springfield, Missouri ("USMCFP-Springfield"), which were redelivered to him at USP-Allenwood.  On September 29, 2020, at 6:37 p.m., the reporting officer documented the following incident:

> On the above date and time inmate Selmon, Timothy Reg. No. 44010-480 made the following direct statement to me: "I will kill your bitch ass out on the yard. I will stab you up when I get out."  Inmate Selmon had earlier demanded the use of the telephone.  Due to his already aggressive behavior; door

kicking and yelling, I declined the usage for officer safety. Inmate Selmon continued to make threatening statements while kicking his cell door. This puts Inmate Selmon in violation of Prohibited Act Code 203, Threatening Another with Bodily Harm.

(Doc. 15-1, p. 53, Incident Report Number 3437786).

On October 8, 2020, the reporting officer described the following incident:

On 10/08/2020, at approximately 13:35, I was conducting rounds on the 10-F unit. While I was talking to another inmate, Mr. Selmon was standing at his door and began talking and trying to get my attention. I approached his door after I was done talking with the other inmate. Mr. Selmon was standing near the door with his right hand below the window. I noticed his right arm moving in an up and down fashion. He began to talk in circles in an attempt to keep me by his door. I looked into his window and saw his right hand on an erect penis and him moving his hand in an up-and-down fashion. I terminated the interaction and notified the unit officer.

(Doc. 15-1, p. 63, Incident Report Number 3440097). Selmon received Incident Report 3440097, charging him with violating Prohibited Act Code 205—engaging in a sexual act.

On October 9, 2020, the reporting officer documented the following incident:

On 10/09/2020, at approximately 1:15 p.m, I was conducting rounds on the 10-F unit. While I was talking to another inmate, Inmate Selmon, Timothy (44010-480) began yelling my name. When I did not respond or acknowledge him, he began cursing at me. I continued conducting my rounds with other inmates. Mr. Selmon then yelled, "I would put my hands around your fucking neck and choke your damn ass if I ever saw you again." I notified the unit officers and the Lieutenant's office.

(Doc. 15-1, p. 73, Incident Report Number 3440369). As a result, Selmon received Incident Report 3440369, charging him with violating Prohibited Act Code 203—threatening another with bodily harm.

On October 10, 2020, the reporting officer described the following incident:

> On 10/10/2020 [a]t approximately 7:35 a.m., I Officer McCune was finishing an irregular round of unit 10-F when Inmate Selmon, Timothy Reg. No. 44010-480 began to scream at me from the 10-F shower.  He informed me that "[b]et, I kill you when I get out of here!" he continued to say "[t]hat's on pyru blood ima kill you when I get out of here!"  The inmate directly threatened my life multiple times.

(Doc. 15-1, p. 102, Incident Report 3440507).  Selmon received Incident Report 3440507,

charging him with violating Prohibited Act Code 203—threatening another with bodily harm.

During his incarceration with the BOP, Selmon filed two administrative remedies.

(Doc. 15-1, pp. 10-11).  On September 20, 2021, Selmon filed Administrative Remedy

Number 1097491-R1 with the Northeast Regional Office regarding an alleged false detainer.

(*Id.* at p. 11).  On September 20, 2021, Selmon filed Administrative Remedy Number

1097492-R1 with the Northeast Regional Office regarding a request for protective custody.

(*Id.*).  Both remedies were rejected because Selmon bypassed the institution level of the

administrative process.  (*Id.*).  Selmon did not file a final appeal to the Central Office with

respect to either administrative remedy.  (*See id.*).

## II.    Standards of Review

Selmon challenges the denial of his pre-release placement *via* 28 U.S.C. § 2241.

Section 2241 "confers habeas jurisdiction to hear the petition of a federal prisoner who is

challenging not the validity but the execution of his sentence."  *Coady v. Vaughn*, 251 F.3d

480, 485 (3d Cir. 2001).  A habeas corpus petition filed pursuant to 28 U.S.C. § 2241 is the

appropriate means for a federal inmate to challenge a BOP decision to limit or exclude their

placement in an RRC.  *See Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 243-44 (3d

4

Cir. 2005). Review of the RRC placement decision is limited to whether the BOP abused its discretion. *Vasquez v. Strada*, 684 F.3d 431, 434 (3d Cir. 2012) (citing *Barden v. Keohane*, 921 F.2d 476, 478 (3d Cir. 1991)).

Additionally, Selmon's claims, that his due process rights were violated in the context of the disciplinary hearing process, which resulted in a loss of good conduct time, are properly the subject of this habeas petition because it directly impacts the duration of his confinement.

## III.   Discussion

### A.   Exhaustion of Administrative Review

Despite the absence of a statutory exhaustion requirement attached to § 2241, courts have consistently required a petitioner to exhaust administrative remedies prior to bringing a habeas claim under § 2241. *Callwood v. Enos*, 230 F.3d 627, 634 (3d Cir. 2000); *Moscato v. Federal Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996). Exhaustion is required "for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." *Moscato*, 98 F.3d at 761-62 (citing *Bradshaw v. Carlson*, 682 F.2d 1050, 1052 (3d Cir. 1981) (*per curiam*)). Thus, "a federal prisoner who . . . fails to exhaust his administrative remedies because of a procedural default, and subsequently finds closed all additional avenues of administrative

remedy, cannot secure judicial review of his habeas claim absent a showing of cause and

prejudice." *See id.* at 762.  However, exhaustion is not required when it would not promote

these goals, such as when exhaustion would be futile.  *See, e.g.*, *Gambino v. Morris*, 134

F.3d 156, 171 (3d Cir. 1998) (exhaustion not required where petitioner demonstrates

futility); *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988) (exhaustion may be

excused where it "would be futile, if the actions of the agency clearly and unambiguously

violate statutory or constitutional rights, or if the administrative procedure is clearly shown to

be inadequate to prevent irreparable harm"); *Carling v. Peters*, No. 00-2958, 2000 WL

1022959, at *2 (E.D. Pa. July 10, 2000) (exhaustion not required where delay would subject

petitioner to "irreparable injury").

The BOP has established a multi-tier system whereby a federal prisoner may seek

formal review of any aspect of his imprisonment.  28 C.F.R. §§ 542.10-542.19 (2005)).  If an

issue raised by the inmate cannot be resolved through this administrative remedy system,

the BOP will refer the inmate to appropriate statutorily mandated procedures.  28 C.F.R. §

542.10(c).  The system first requires an inmate to present their complaint to staff before

filing a request for administrative relief, which staff shall attempt to informally resolve.  28

C.F.R. § 542.13(a).  If informal resolution is unsuccessful, an inmate may file a formal

written complaint to the Warden, on the appropriate form, within twenty calendar days of the

date of the event or occurrence and the Warden shall provide a response within twenty

calendar days.  28 C.F.R. §§ 542.14, 542.18.  If the inmate is dissatisfied with the Warden's

6

response, he may file an appeal to the Regional Director within twenty calendar days.  28

C.F.R. § 542.15(a).  The Regional Director has thirty calendar days to respond.  28 C.F.R. §

542.18.  Finally, if the inmate is dissatisfied with the Regional Director's response, that

decision may be appealed to the BOP's General Counsel at Central Office within thirty

calendar days from the date of the Regional Director's response.  28 C.F.R. § 542.15(a).

No administrative remedy appeal is considered fully exhausted until reviewed by the BOP's

Central Office.  28 C.F.R. § 542.15(a).

The BOP maintains a database known as the SENTRY Inmate Management System

("SENTRY").  In the ordinary course of business, computerized indexes of all formal

administrative remedies filed by inmates are maintained by the Institution, Regional, and

Central Offices.  SENTRY generates a report titled "Administrative Remedy Generalized

Retrieval" which allows codes to be entered to identify the reason or reasons for rejecting a

request for administrative relief.

Selmon's Administrative Remedy Generalized Retrieval report reveals that he only

filed two administrative remedies while in BOP custody and he did not properly exhaust

either administrative remedy.  (Doc. 10-1, pp. 10-11, Administrative Remedy Generalized

Retrieval).  The record before the Court indicates that on September 20, 2021, Selmon filed

Administrative Remedy Number 1097491-R1 with the Northeast Regional Office regarding a

false detainer.  (*Id.* at p. 11).  His request was rejected on October 13, 2021, and he did not

appeal.  (*Id.*).  On September 20, 2021, Selmon filed Administrative Remedy Number

1097492-R1 with the Northeast Regional Office regarding a request for protective custody. (*Id.*). His request was rejected on October 13, 2021, and he did not appeal. (*Id.*). Both remedies were rejected because Selmon bypassed the institution level of the administrative process. (*Id.*). Selmon was required to first file BP-9 forms at the institution level before appealing to the Regional Office. Selmon did not appeal the denials to the Central Office and failed to take any further action with respect to these administrative remedies. (*See id.*).

It is undisputed that Selmon commenced the instant action without first exhausting the BOP's administrative remedy procedure. He cannot avoid the exhaustion requirement by simply asserting that the administrative remedy process is futile. Selmon's § 2241 petition must be dismissed for failure to exhaust administrative remedies. To hold otherwise would frustrate the purposes of the exhaustion doctrine by allowing Selmon to invoke the judicial process despite failing to complete administrative review. Nevertheless, the Court will address the merits of his petition below.

## B. RRC Determination

The Supreme Court has consistently held that a prisoner has no constitutional right to be confined in a particular place. *See McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers.");

*Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished

the defendant's liberty interest to empower the State to confine him in any of its prisons.").

The Attorney General—and by delegation the BOP—has exclusive authority and discretion

to designate the place of an inmate's confinement.  *See Woodall*, 432 U.S. at 251.

On April 9, 2008, the Second Chance Act of 2007, Pub.L. No. 110-199, Title II, §

251, 122 Stat. 657, 697, codified at 18 U.S.C. §§ 3621, 3624, went into effect.  The Second

Chance Act provides:

> (c) Prerelease custody. —
>
> (1) In general. —The Director of the Bureau of Prisons shall, to the extent
> practicable, ensure that a prisoner serving a term of imprisonment spends a
> portion of the final months of that term (not to exceed 12 months), under
> conditions that will afford that prisoner a reasonable opportunity to adjust to
> and prepare for the reentry of that prisoner into the community.  Such
> conditions may include a community correctional facility.
>
> (2) Home confinement authority. —The authority under this subsection may
> be used to place a prisoner in home confinement for the shorter of 10 percent
> of the term of imprisonment of that prisoner or 6 months.

18 U.S.C. § 3624(c).  The Act requires the BOP "to make an individual determination that

ensures that the placement is 'of sufficient duration to provide the greatest likelihood of

successful reintegration into the community.'"  *Wilson v. Strada*, 474 F. App'x 46, 46-47 (3d

Cir. 2012) (quoting 18 U.S.C. § 3624(c)(6)(C)).  In doing so, the BOP must consider: "(1) the

resources of the facility contemplated; (2) the nature and circumstances of the offense; (3)

the history and characteristics of the prisoner; (4) any statement by the court that imposed

the sentence [ ] recommending a type of penal or correctional facility as appropriate; and (5)

any pertinent policy statement issued by the Sentencing Commission." 18 U.S.C. § 3621(b); *see also Vasquez*, 684 F.3d at 433.

Likewise, the First Step Act does not mandate that the BOP place prisoners in a halfway house for six months or any other period.  Under 18 U.S.C. § 3624(c), the BOP is authorized to consider placing an inmate in a community correctional facility for up to twelve months.  However, a prisoner is neither entitled nor guaranteed such placement for any minimum amount of time.  18 U.S.C. § 3624(c). *See Woodall*, 432 F.3d 235 at 240.  Such placement decisions are solely within the discretion of the BOP.  The First Step Act did not alter this rule.[1]

In a nutshell, when considering an individual's eligibility for pre-release placement in an RRC, the BOP is required to ensure that decisions are made: (A) consistent with the five factors in 18 U.S.C. § 3621(b); (B) on an individualized basis; and (C) so that the duration of the placement period gives the inmate the greatest likelihood of successful community reintegration.  18 U.S.C. § 3624(c)(6).

The record in this case clearly establishes that Selmon's Unit Team gave him individualized consideration consistent with the five factors of section 3621(b).  (Doc. 15-1, pp. 12-15).  They found there was available bed space, considered the nature of his offense

---

[1]    The First Step Act expands the Second Chance Act.  The First Step Act allows eligible inmates to earn additional time credits for successfully participating in evidence-based recidivism reduction programming or productive activities.  *See The First Step Act of 2018*, available at https://crsreports.congress.gov/product/pdf/R/R45558 (last visited April 28, 2022).  Nothing in the Second Chance Act or the First Step Act entitles an inmate to guaranteed placement in an RRC.

10

(possession of stolen ammunition), considered his institutional disciplinary history and noted that he had two incident reports and was categorized as a Care Level 3 inmate for mental health purposes, documented that the sentencing court made no recommendations, and noted that the Sentencing Commission has no policy concerning RRC placement.   (*Id.*). They also indicated that Selmon had a detainer, and the other detaining authority would take custody upon his release.   (*Id.*).

After reviewing Selmon's petition and the applicable statutes, the Court finds that the BOP has the discretion to determine if, and when, to transfer Selmon to RRC.  Consistent with 18 U.S.C. § 3621(b), the BOP individually considered Selmon under the factors relevant to RRC placement.  His disagreement with the BOP's RRC placement recommendation does not establish a constitutional violation, as nothing in the Second Chance Act, First Step Act, or § 3621(b) entitles an inmate to any guaranteed placement in an RRC.  *See Woodall*, 432 F.3d at 244-51 (holding, in exercising its discretion to make halfway house placement decisions, the Bureau must consider the factors set forth in § 3621(b); "[h]owever, that the [Bureau] may assign a prisoner to a halfway house does not mean that it must."); *see also Beckley v. Miner*, 125 F. App'x 385, 389 (3d Cir. 2005) (holding, "[i]t is well settled, and the parties agree, that the Bureau has nearly exclusive jurisdiction to classify and transfer prisoners.").

**C.     Disciplinary Proceedings**

### 1.     *BOP Disciplinary Process*

The BOP's disciplinary process is fully outlined in Code of Federal Regulations ("C.F.R."), Title 28, Sections 541 through 541.8. These regulations dictate the manner in which disciplinary action may be taken should a prisoner violate, or attempt to violate, institutional rules.  The first step requires filing an incident report and conducting an investigation pursuant to 28 C.F.R. § 541.5.  Staff is required to conduct the investigation promptly absent intervening circumstances beyond the control of the investigator.  28 C.F.R. § 541.5(b).

Following the investigation, the matter is then referred to the Unit Disciplinary Committee ("UDC") for an initial hearing pursuant to 28 C.F.R. § 541.7.  If the UDC finds that a prisoner has committed a prohibited act, it may impose minor sanctions.  *Id.*  If the alleged violation is serious and warrants consideration for more than minor sanctions, or involves a prohibited act listed in the greatest or high category offenses, the UDC refers the matter to a Disciplinary Hearing Officer ("DHO") for a hearing.  *Id.*  Greatest Severity category offenses carry a possible sanction of, *inter alia*, loss of good conduct time credits. *Id.* § 541.3.  In the event that a matter is referred for a hearing, the Warden is required to give the inmate advance written notice of the charges no less than 24 hours before the DHO hearing and offer the inmate a full-time staff member to represent him at the DHO hearing. *Id.* § 541.8 (c) and (d).

At the DHO hearing, the inmate is "entitled to make a statement and present documentary evidence" and has the right to present documents and submit names of requested witnesses and have them called to testify. *Id.* § 541.8(f). The DHO shall "call witnesses who have information directly relevant to the charge[s] and who are reasonably available." *Id.* § 541.8(f)(2). The DHO need not call repetitive witnesses or adverse witnesses. *Id.* § 541.8(f)(3). The inmate has the right to be present throughout the DHO hearing except during "DHO deliberations or when [his] presence would jeopardize institution security, at the DHO's discretion." *Id.* § 541.8(e). The DHO must "consider all evidence presented during the hearing." *Id.* § 541.8(f). "The DHO's decision will be based on at least some facts and, if there is conflicting evidence, on the greater weight of the evidence." *Id.* The DHO has the authority to dismiss any charge, find a prohibited act was committed, and impose available sanctions. *Id.* § 541.8. The DHO must prepare a record of the proceedings sufficient to document the advisement of inmate rights, DHO's findings, "DHO's decision", specific "evidence relied on by the DHO" and must identify the reasons for the sanctions imposed. *Id.* § 541.8(f)(2). A copy must be delivered to the inmate. *Id.*

## 2. *Incident Reports Challenged in the Habeas Petition*

### a.    <u>Incident Report Number 3437786</u>

On September 30, 2020, Selmon received Incident Report Number 3437786, charging him with violating Prohibited Act Code 203, threatening another with bodily harm. (Doc. 15-1, p. 53, Incident Report Number 3437786). On July 29, 2021, another copy of the

Incident Report was delivered to Selmon at USP-Allenwood because he was housed at various non-BOP facilities before arriving at USP-Allenwood. (*Id.* at p. 54). At the time of delivery of the Incident Report, officials advised Selmon of his rights, including his right to remain silent. (*Id.*). He indicated that he understood his rights and declined to make a comment regarding the incident. (*Id.*). On July 30, 2021, a UDC hearing was held, and the charges were referred to the DHO due to the serious nature of the alleged incident. (*Id.* at p. 56).

On July 30, 2021, a staff member informed Selmon of his rights at the DHO hearing and provided him with a copy of the "Inmate Rights at Discipline Hearing" form. (*Id.* at p. 58, Inmate Rights at Discipline Hearing). Selmon was also provided with a "Notice of Discipline Hearing before the Discipline Hearing Officer (DHO)" form. (*Id.* at p. 59, Notice of Discipline Hearing before the DHO). Selmon refused to sign the forms, declined representation by a staff member, and declined to call witnesses on his behalf. (*Id.* at pp. 58, 59).

The DHO hearing convened on August 16, 2021 regarding the Code 203 violation. (*Id.* at p. 60). During the August 16, 2021 hearing, the DHO confirmed that Selmon received advanced written notice of the charges and that he had been advised of his rights before the DHO. (*Id.*). Selmon declined a staff representative, waived his right to call witnesses, expressed an understanding of his rights before the DHO, and denied the charges. (*Id.*). He provided the following statement: "I didn't make that statement." (*Id.*). Selmon cited no procedural issues and did not present any documentary evidence. (*Id.*).

14

The DHO noted a delay in the discipline process due to Selmon being in transit from his former institution.  (*Id.*).  The DHO did not believe that the delay hindered Selmon's ability to defend himself, and Selmon did not raise any issue with the delay.  (*Id.*).

The DHO found sufficient evidence that Selmon committed the Code 203 violation after considering and relying upon the incident report and investigation, the Warden's extension of time regarding the UDC hearing, a report from Psychology Services that Selmon was mentally competent and responsible for the misconduct, and Selmon's statement during the hearing.  (*Id.* at p. 61).  The finding of guilt resulted in disallowance of 27 days of good conduct time, 30 days disciplinary segregation, and loss of privileges for 6 months.  (*Id.*).

On August 23, 2021, the DHO Report for Incident Report Number 3437786 was delivered to Selmon, and he was advised of his appeal rights.  (*Id.* at p. 62).

**b.   Incident Report Number 3440097**

On October 8, 2020, Selmon received Incident Report Number 3440097, charging him with violating Prohibited Act Code 205, engaging in a sexual act.  (Doc. 15-1, p. 63, Incident Report Number 3440097).  Because Selmon was moving between various non-BOP facilities, he received a second copy of the Incident Report on July 29, 2021 at USP-Allenwood.  (*Id.* at p. 64).  At the time of delivery of the Incident Report, officials advised Selmon of his rights, including his right to remain silent.  (*Id.*).  He indicated that he understood his rights and declined to make a comment regarding the incident.  (*Id.*).  On

July 30, 2021, a UDC hearing was held, and the charges were referred to the DHO due to the serious nature of the alleged incident. (*Id.* at p. 66).

On July 30, 2021, a staff member informed Selmon of his rights at the DHO hearing and provided him with a copy of the "Inmate Rights at Discipline Hearing" form. (*Id.* at p. 68, Inmate Rights at Discipline Hearing). Selmon was also provided with a "Notice of Discipline Hearing before the Discipline Hearing Officer (DHO)" form. (*Id.* at p. 69, Notice of Discipline Hearing before the DHO). Selmon refused to sign the forms, declined representation by a staff member, and declined to call witnesses on his behalf. (*Id.* at pp. 68, 69).

On August 16, 2021, a DHO hearing was held regarding the Code 205 violation. (*Id.* at p. 70). During the August 16, 2021 hearing, the DHO confirmed that Selmon received advanced written notice of the charges and that he had been advised of his rights before the DHO. (*Id.*). Selmon declined a staff representative, waived his right to call witnesses, expressed an understanding of his rights before the DHO, and admitted the charges. (*Id.*). He provided the following statement: "You may as well find me guilty, the report is true." (*Id.*). Selmon cited no procedural issues and did not present any documentary evidence. (*Id.*). The DHO again noted a delay in the discipline process due to Selmon being in transit from his former institution. (*Id.*). The DHO did not believe that the delay hindered Selmon's ability to defend himself, and Selmon did not present any concerns with the delay. (*Id.*).

The DHO found sufficient evidence that Selmon committed the Code 205 violation after considering and relying upon the incident report and investigation, the Warden's

extension of time regarding the UDC hearing, a report from Psychology Services that Selmon was mentally competent and responsible for the misconduct, and Selmon's admission of guilt.  (*Id.* at p. 71).  The finding of guilt resulted in disallowance of 27 days of good conduct time, 30 days disciplinary segregation, and loss of privileges for 6 months. (*Id.*).

On August 23, 2021, the DHO Report for Incident Report Number 3440097 was delivered to Selmon, and he was advised of his appeal rights.  (*Id.* at p. 72).

### c.   Incident Report Number 3440369

On October 9, 2020, Selmon received Incident Report Number 3440369, charging him with violating Prohibited Act Code 203, threatening another with bodily harm.  (Doc. 15-1, p. 73, Incident Report Number 3440369).  On July 29, 2021, Selmon received a second copy of the Incident Report at USP-Allenwood.  (*Id.* at p. 74).  At the time of delivery of the Incident Report, prison officials advised Selmon of his rights, including his right to remain silent.  (*Id.*).  He indicated that he understood his rights and declined to make a comment regarding the incident.  (*Id.*).  On July 30, 2021, a UDC hearing was held, and the charges were referred to the DHO due to the serious nature of the alleged incident.  (*Id.* at p. 56).

On July 30, 2021, a staff member informed Selmon of his rights at the DHO hearing and provided him with a copy of the "Inmate Rights at Discipline Hearing" form.  (*Id.* at pp. 77, 96, Inmate Rights at Discipline Hearing).  Selmon was also provided with a "Notice of Discipline Hearing before the Discipline Hearing Officer (DHO)" form.  (*Id.* at p. 97, Notice of

Discipline Hearing before the DHO).  Selmon refused to sign the forms, declined representation by a staff member, and declined to call witnesses on his behalf.  (*Id.* at pp. 77, 96, 97).

The DHO hearing convened on August 16, 2021 regarding the Code 203 violation. (*Id.* at p. 99).  During the August 16, 2021 hearing, the DHO confirmed that Selmon received advanced written notice of the charges and that he had been advised of his rights before the DHO.  (*Id.*).  Selmon declined a staff representative, waived his right to call witnesses, expressed an understanding of his rights before the DHO, and admitted the charges.  (*Id.*).  He provided the following statement: "It don't matter, I'm guilty."  (*Id.*). Selmon cited no procedural issues and did not present any documentary evidence.  (*Id.*). The DHO noted a delay in the discipline process due to Selmon being transferred from another institution.  (*Id.*).  The DHO did not believe that the delay hindered Selmon's ability to defend himself, and Selmon did not raise any issue with the delay.  (*Id.*).

The DHO found sufficient evidence that Selmon committed the Code 203 violation after considering and relying upon the incident report and investigation, the Warden's extension of time regarding the UDC hearing, a report from Psychology Services that Selmon was mentally competent and responsible for the misconduct, and Selmon's admission of guilt.  (*Id.* at p. 100).  The finding of guilt resulted in disallowance of 27 days of good conduct time, forfeiture of 27 days of non-vested good conduct time, and loss of privileges for 8 months.  (*Id.*).

On August 23, 2021, the DHO Report for Incident Report Number 3440369 was delivered to Selmon, and he was advised of his appeal rights. (*Id.* at p. 62).

### d.   Incident Report Number 3440507

On October 9, 2020, Selmon received Incident Report Number 3440507, charging him with violating Prohibited Act Code 203, threatening another with bodily harm. (Doc. 15-1, p. 102, Incident Report Number 3440507). On July 29, 2021, while housed at USP-Allenwood, Selmon received a second copy of the Incident Report. (*Id.* at p. 103). At the time of delivery of the Incident Report, officials advised Selmon of his rights, including his right to remain silent. (*Id.*). He indicated that he understood his rights and declined to make a comment regarding the incident. (*Id.*). On July 30, 2021, a UDC hearing was held, and the charges were referred to the DHO due to the serious nature of the alleged incident. (*Id.* at p. 105).

On July 30, 2021, a staff member informed Selmon of his rights at the DHO hearing and provided him with a copy of the "Inmate Rights at Discipline Hearing" form. (*Id.* at p. 107, Inmate Rights at Discipline Hearing). Selmon was also provided with a "Notice of Discipline Hearing before the Discipline Hearing Officer (DHO)" form. (*Id.* at p. 108, Notice of Discipline Hearing before the DHO). Selmon refused to sign the forms, declined representation by a staff member, and declined to call witnesses on his behalf. (*Id.* at pp. 107, 108).

The DHO hearing convened on August 16, 2021 regarding the Code 203 violation. (*Id.* at p. 109).  During the August 16, 2021 hearing, the DHO confirmed that Selmon received advanced written notice of the charges and that he had been advised of his rights before the DHO.  (*Id.*).  Selmon declined a staff representative, waived his right to call witnesses, expressed an understanding of his rights before the DHO, and admitted the charges.  (*Id.*).  He provided the following statement: "I'm guilty."  (*Id.*).  Selmon cited no procedural issues and did not present any documentary evidence.  (*Id.*).  Once again, the DHO noted a delay in the discipline process due to Selmon being in transit from another institution.  (*Id.*).  The DHO did not believe that the delay hindered Selmon's ability to defend himself, and Selmon did not raise any issue with the delay.  (*Id.*).

The DHO found sufficient evidence that Selmon committed the Code 203 violation after considering and relying upon the incident report and investigation, the Warden's extension of time regarding the UDC hearing, a report from Psychology Services that Selmon was mentally competent and responsible for the misconduct, and Selmon's admission of guilt.  (*Id.* at p. 110).  The finding of guilt resulted in disallowance of 27 days of good conduct time, forfeiture of 27 days of non-vested good conduct time, and loss of privileges for 6 months.  (*Id.*).

On August 23, 2021, the DHO Report for Incident Report Number 3440507 was delivered to Selmon, and he was advised of his appeal rights.  (*Id.* at p. 111).

### 3.   *Discussion*

Selmon claims that his due process rights were violated in the context of the disciplinary hearing process.  The Due Process Clause of the Fifth Amendment of the Constitution of the United States provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Federal inmates possess a liberty interest in good conduct time.  *See Wolff v. McDonnell*, 418 U.S. 539, 555-57 (1974); *Young v. Kann*, 926 F.2d 1396, 1399 (3d Cir. 1991).

When a prison disciplinary hearing may result in the loss of good conduct time credits, due process requires that the prisoner receive certain due process protections: (1) written notice of the claimed violation at least twenty-four (24) hours in advance of the hearing; (2) the opportunity to call witnesses and present documentary evidence when consistent with institutional and correctional goals; (3) assistance in presenting a defense if the inmate is illiterate; (4) an impartial tribunal; and (5) a written statement by the factfinder as to evidence relied on and reasons for the disciplinary action.  *See Wolff*, 418 U.S. at 564.

Where the due process requirements are met, the decision of the hearing examiner will be upheld if there is "some evidence" in the record to support the decision. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *see also Young*, 926 F.2d at 1402-03 (applying *Hill* standard to federal prisoner due process challenges to prison disciplinary proceedings).  The determination of whether the standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or

weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455.

With respect to Incident Report Numbers 3437786, 3440097, 3440369, and 3440507, the Court first observes that the UDC hearings were not held within five working days of staff's knowledge of the alleged misconduct. On July 30, 2021, the Warden at USP-Allenwood noted that because Selmon was in transit from USMCFP-Springfield, the UDC hearings did not occur within the five-day period. (Doc. 15-1, p. 86). Therefore, the Warden granted an extension of time to hold the UDC hearings beyond five working days. 28 C.F.R. § 541.7(b) states that "[t]he UDC will ordinarily review the incident report within five work days after it is issued, not counting the day it was issued, weekends, and holidays." However, the regulations do not mandate such a timeframe. This is not a situation where Selmon was denied a hearing before the UDC, and Selmon does not argue any harm or prejudice suffered as a result of the UDC holding his initial hearings outside of the "ordinary" five-day period. Additionally, it is undisputed that Selmon received notice of the charges against him at least twenty-four hours in advance of the disciplinary hearings. *See Wolff*, 418 U.S. at 564.

Next, in accordance with *Hill*, there need only be "some evidence" to support the disciplinary decision. 472 U.S. at 455-56; *see also Denny v. Schultz*, 708 F.3d 140, 145 (3d Cir. 2013) (noting that the Court "need only find that the [Hearing Officer's] decision had

'some basis in fact' in order to affirm the decision as comporting with the Due Process Clause").

Regarding Incident Report Numbers 3437786, 3440097, 3440369, and 3440507, in concluding that the greater weight of the evidence supported a finding of guilt, the DHO considered the incident reports and investigations, the Warden's extension of time regarding the UDC hearings, a report from Psychology Services that Selmon was mentally competent and responsible for the misconduct, and Selmon's statements during the hearings. With respect to Incident Report Numbers 3440097, 3440369, and 3440507, the DHO also considered Selmon's admission of guilt. The DHO's reliance on such documentary evidence supports a conclusion that the decisions have some basis in fact and are supported by some evidence.

Finally, the Court finds that all sanctions imposed by the DHO in the four proceedings were within the limits of 28 C.F.R. § 541, *et seq*. Selmon was found guilty of four 200-level, high severity prohibited acts. Pursuant to 28 C.F.R. § 541.3, the following are the sanctions available for 200-level prohibited acts:

A.      Recommend parole date rescission or retardation.

B.      Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1      Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

B.2      Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed.

23

C.    Disciplinary segregation (up to 6 months).
D.    Make monetary restitution.
E.    Monetary fine.
F.    Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).
G.    Change housing (quarters).
H.    Remove from program and/or group activity.
I.    Loss of job.
J.    Impound inmate's personal property.
K.    Confiscate contraband.
L.    Restrict to quarters.
M.    Extra duty.

28 C.F.R. § 541.3 (Table 1).

The sanctions imposed by the DHO with respect to Incident Report Numbers 3437786, 3440097, 3440369, and 3440507 were consistent with the severity level of the prohibited acts and within the maximum available to the DHO.

Further, "[t]he Eighth Amendment is violated only when a punishment is grossly disproportionate to the severity of the offense." *Levi v. Holt*, 192 F. App'x 158, 162 (3d Cir. 2006) (citing *Rummel v. Estelle*, 445 U.S. 263, 271-74 (1980)). Therefore, only sanctions that "impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," may be deemed excessive. *Moles v. Holt*, 221 F. App'x 92, 95 (3d Cir. 2007) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The penalties imposed here, loss of good conduct time, disciplinary segregation and loss of privileges, do not work an "atypical and significant hardship" on Selmon and do not serve to extend his confinement beyond the expected parameters of his sentence. *Sandin*, 515 U.S. at 484-85. Consequently, he is not entitled to relief.

24

IV.     <u>Conclusion</u>

Based on the foregoing, the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 will be denied.  A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: April 28, 2022